# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DANIEL J.A. WEBB,
    Plaintiff,

    v.

LEO ARNONE, et al.,
    Defendants.

No. 3:17-cv-01624 (SRU)

## INITIAL REVIEW ORDER

Daniel J.A. Webb—a prisoner currently incarcerated at Northern Correctional Institution

("Northern")—has filed a complaint under 42 U.S.C. § 1983, the Americans with Disabilities

Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794, against

current and former Commissioners of Correction Leo Arnone, James Dzurenda, Brian Murphy,

and Scott Semple; current and former Wardens Eduardo Maldonado, Anne Cournoyer, and

William Mulligan; and District Administrator/Warden Angel Quiros. Webb also seeks the

appointment of *pro bono* counsel.

## I.    Complaint [Doc. No. 1]

Under section 1915A of Title 28 of the United States Code, I must review prisoner civil

complaints and dismiss any portion of the complaint that is frivolous, malicious, or fails to state a

claim upon which relief may be granted, or that seeks monetary relief from a defendant who is

immune from such relief. 28 U.S.C. § 1915A. Although detailed allegations are not required, the

complaint must include sufficient facts to afford the defendants "fair notice" of the claims and

grounds upon which they are based and to "raise a right to relief above the speculative level."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Conclusory" allegations are not

sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to

state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Nevertheless, it is well-established that "[p]ro se complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

On April 25, 2012, Governor Dannel P. Malloy signed into law An Act Revising the Penalty for Capital Felonies, which prospectively repealed the death penalty for capital felonies committed after its enactment. *See* P.A. No. 12-5. For prisoners who had been sentenced to death prior to April 25, 2012, and whose sentences were subsequently "reduced to a sentence of life imprisonment without the possibility of release by a court of competent jurisdiction," the act provided that the Commissioner of Correction "shall place [the] inmate on special circumstances high security status and house the inmate in administrative segregation until a reclassification process is completed." *See id.* at § 37(a) (codified at Conn. Gen. Stat. § 18-10b(a)). The act also directed the Commissioner to "establish a reclassification process" that would "include an assessment of the risk a[] [former death row] inmate . . . poses to staff and other inmates," as well as "an assessment of whether such risk requires the inmate's placement in administrative segregation or protective custody." *See id.* at § 37(b) (codified at Conn. Gen. Stat. § 18-10b(b) & (c)). The act required "[t]he commissioner [to] place such inmate in a housing unit for the maximum security population if, after completion of such reclassification process, the commissioner determines such placement is appropriate," and to subject the inmate to "conditions of confinement which shall include, but not be limited to," the following:

(i) that the inmate's movements be escorted or monitored,

(ii) movement of the inmate to a new cell at least every ninety days,

(iii) at least two searches of the inmate's cell each week,

(iv) that no contact be permitted during the inmate's social visits,

(v) that the inmate be assigned to work assignments that are within the assigned housing unit, and

(vi) that the inmate be allowed no more than two hours of recreational activity per day.

*Id.* at § 37(c)(1) (codified at Conn. Gen. Stat. § 18-10b(c)(1)). Finally, the statute directed "[t]he commissioner [to] conduct an annual review of such inmate's conditions of confinement within such housing unit," and permitted the commissioner "for compelling correctional management or safety reasons" to "modify any condition of confinement." *Id.* at § 37(c)(2).

On August 25, 2015, the Connecticut Supreme Court concluded that "following the enactment of P.A. 12-5, Connecticut's capital punishment scheme no longer comport[ed] with [the] state's contemporary standards of decency" and "no longer serve[d] any legitimate penological goal." *State v. Santiago*, 318 Conn. 1, 86, 118 (2015). As a result, capital punishment "offend[ed] the state constitutional prohibition against excessive and disproportionate punishment" and "violate[d] article first, [sections] 8 and 9, of the Connecticut constitution."[1] *Id.* at 86, 119. Therefore, the Court held that "the state constitution no longer permit[ted] the execution of individuals sentenced to death for crimes committed prior to the enactment of P.A. 12-5." *Id.* at 14–15.

On the same day that *Santiago* was issued, Webb and other prisoners sent written requests to former Warden Cournoyer asking to be removed from the restrictive conditions

---

[1] Article first, section 8 of the Connecticut Constitution provides in pertinent part, "No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law, nor shall excessive bail be required nor excessive fines imposed." Article first, section 9 of the Connecticut Constitution provides, "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

imposed on them as death row inmates. *See* Compl., Doc. No. 1, at ¶ 9. Former Warden

Cournoyer informed Webb that prison officials would reclassify him in accordance with Conn.

Gen. Stat. § 18-10b after Webb had been re-sentenced to a term of life without the possibility of

release. *See id.* at ¶ 10.

On July 26, 2016, the Connecticut Supreme Court concluded that the death penalty was

unconstitutional as applied to Webb, reversed the judgment of the Superior Court denying

Webb's petition for writ of habeas corpus, and remanded the case with instructions to grant the

petition and to resentence Webb accordingly. *See Webb v. Comm'r of Corr.*, 322 Conn. 187, 191

(2016) (per curiam). On September 9, 2016, the Superior Court resentenced Webb to a term of

life without the possibility of release. *See* Compl., Doc. No. 1, at ¶ 12.

On September 22, 2016, former Warden Mulligan informed Webb that there would be no

change in his classification and that he would remain on restraint status and subject to the same

conditions of confinement to which he had previously been subject as a death row inmate. *See id.*

at ¶ 15. On December 1, 2016, the Director of Classification and Population Management

informed Webb that the reclassification process pursuant to Conn. Gen. Stat. § 18-10b was

complete, and that he would remain on special circumstances high security status. *See id.* at ¶ 18.

Webb claims that two other former death row inmates were reclassified in August 2015

and transferred out of state to serve their sentences. *See id.* at ¶ 11. He contends that the

conditions of confinement in the out-of-state prisons are significantly less restrictive. *See id.*

Webb believes that two more former death row inmates were reclassified in October 2016 and

removed from special circumstances status. *See id.* at ¶ 16. Under their new classification status,

both inmates were permitted to move outside of their cells without restraints. *See id.* at ¶ 17.

On January 21, 2017, Webb wrote to Commissioner Semple and former Warden Mulligan seeking to be removed from special circumstances high security status and, in particular, the restraint requirements of that status. *See id.* at ¶ 20. Webb did not receive a response from Commissioner Semple. *See id.*

On February 1, 2017, Webb received a copy of his classification review, which indicated that he would remain on special circumstances status because of his prior violent behavior. *See id.* at ¶ 21. On February 7, 2017, former Warden Mulligan informed Webb that he was being treated differently from other former death row inmates because of his prior violent behavior. *See id.* at ¶ 22.

Webb has repeatedly submitted grievances challenging his current classification status. *See id.* ¶ 74. Webb claims that the defendants have violated the Due Process Clause of the Fourteenth Amendment by failing to provide him with procedural due process in connection with his initial and continued placement on special circumstances high security status. Webb also alleges that the defendants have violated the Eighth Amendment, by imposing restraint requirements disproportionate to the safety and security risk he poses to inmates and staff, and the Equal Protection Clause of the Fourteenth Amendment, by treating him differently than other former death row inmates. Webb seeks declaratory and injunctive relief and monetary damages.

A. Eighth Amendment Claim

Webb has named as defendants a number of prior Commissioners of the Department of Correction and prior Wardens of Northern, as well as the current Warden of Northern and the current Commissioner of Correction. He generally asserts that the defendants were responsible for housing him at Northern under restrictive conditions of confinement.

According to the website for the Department of Correction, Leo Arnone was Commissioner of Correction from 2010 to 2013, James Dzurenda was Commissioner from 2013 to 2014, and Scott Semple is the current Commissioner. Angel Quiros was the Warden at Northern from 2009 to 2011, Eduardo Maldonado was the Warden from 2011 to 2014, Anne Cournoyer was the Warden from 2014 to 2016, and Nick Rodriguez is the current Warden. Although Webb identifies Brian Murphy as a former Commissioner of Correction and William Mulligan as a former Warden at Northern, the website does not list either person in those positions. William Mulligan is the current Warden at MacDougall-Walker Correctional Institution, and Anne Cournoyer is the current Warden at Enfield Correctional Institution.

In addition to Webb's allegations regarding the more recent changes in his classification status, the complaint includes allegations regarding incidents that occurred in 2009, 2010 and 2012 at Northern. *See* Compl., Doc. No. 1, ¶¶ 50–71. The only defendant named in connection with those incidents is Angel Quiros, who was Warden at Northern during part of that time period. Webb asserts that former Warden Cournoyer, current Warden Mulligan, and current Commissioner Semple were involved in the imposition or continuation of the restrictive conditions of confinement at Northern since 2015, after the Connecticut Supreme Court found the death penalty unconstitutional as applied to former death row inmates. Webb asserts no specific factual allegations against former Commissioners Arnone or Dzurenda or former Wardens Murphy or Maldonado.

Clearly, Webb's allegations regarding incidents that occurred from 2009 to 2012 are barred by the statute of limitations. *See Lounsbury v. Jeffries*, 25 F.3d 131, 134 (2d Cir. 1994) (holding that, in Connecticut, the limitations period for section 1983 actions is borrowed from the general three-year personal injury statute of limitations period set forth in Conn. Gen. Stat. §

52-577). Moreover, I note that Webb has asserted claims regarding the same incidents that occurred in 2009, 2010 and 2012 in another case, *Webb v. Armstrong*, No. 3:11-cv-01557 (RNC). That case remains pending. In addition, with regard to the allegations about the restrictive conditions of confinement at Northern (including the restraint policy) from 2012 to the present, Webb previously filed another complaint naming the same defendants and asserting claims regarding the same conditions of confinement as he has in the present case. *See Webb v. Semple*, No. 3:17-cv-01623 (SRU).

The prior pending action doctrine states that, where two lawsuits in the same court include the same claims, "the first suit [filed] should have priority." *Adam v. Jacobs*, 950 F.2d 89, 92 (2d Cir. 1991). "In administering its docket, a district court may dismiss a second suit as duplicative of an earlier suit, unless there are special circumstances, not present here, that favor giving priority to the second." *Taylor v. Rodriguez*, 238 F.3d 188, 197 (2d Cir. 2001) (internal citation omitted); *see also* C*urtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000) ("[A] court faced with a duplicative suit will commonly stay the second suit, dismiss it without prejudice, enjoin the parties from proceeding with it, or consolidate the two actions."); *Edwards v. N. Am. Power & Gas*, 2016 WL 3093356, at *3 (D. Conn. June 1, 2016) ("Where two pending actions address the same legal claims and conduct, the court may dismiss the second action as long as the controlling issues in the dismissed action will be determined in the other lawsuit.") (internal quotation marks omitted). The prior pending action doctrine may be applied to dismiss specific claims within one lawsuit that have been raised by a prior pending lawsuit. *See, e.g.*, *Brown v. Semple*, 2017 WL 4246776, at *12 (D. Conn. Sept. 25, 2017) (dismissing three claims as barred by prior pending action doctrine and for failure to comply with Rules 8 and 20 of the Federal

Rules of Civil Procedure); *Harnage v. Caldonero*, 2017 WL 2190057, at *5 (D. Conn. May 18, 2017) (dismissing two claims under prior pending action doctrine).

Because Webb includes the same defendants and claims relating to his conditions of confinement at Northern from 2009 to the present in his prior two cases, those claims are barred by the prior pending action doctrine. The allegations against former Warden Quiros for conduct that occurred before 2012 also are barred by the statute of limitations. *See Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) (holding that a complaint can be dismissed on initial review based on a defense that appears on the face of the complaint). Therefore, I dismiss under section 1915A(b)(1) the Eighth Amendment conditions of confinement claims against all defendants.

B. Fourteenth Amendment Equal Protection Claim

Webb alleges that after the Connecticut Supreme Court abolished the death penalty in August 2015, defendants Cournoyer, Semple and Mulligan violated his right to equal protection of the laws by permitting similarly situated inmates to be able to move outside of their cells without restraints. The Supreme Court has recognized that "[t]he Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). "This provision does not mandate identical treatment for each individual," however; "rather[,] it requires that similarly situated persons be treated the same." *Muhmmaud v. Murphy*, 632 F. Supp. 2d 171, 178 (D. Conn. 2009) (citing *City of Cleburne*, 473 U.S. at 439–40).

In order to prove a violation of the Equal Protection Clause, a plaintiff must demonstrate evidence of "purposeful discrimination . . . directed at an identifiable or suspect class." *Giano v.*

*Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (internal citations omitted). Thus, to prevail on an equal protection claim, a plaintiff must allege that (1) he or she was treated differently from others similarly situated; and (2) such different treatment was based on impermissible considerations such as "race, religion, national origin or some other constitutionally protected characteristic." *See Colantuono v. Hockeborn*, 801 F. Supp. 2d 110, 118 (W.D.N.Y. 2011).

Webb claims that, by continuing to require him to wear restraints any time he left his cell, the defendants treated him differently than other similarly situated inmates who were formerly on death row. He does not allege that the defendants treated him differently because of his membership in a protected class or based on any other impermissible characteristic.

A plaintiff who is not a member of a protected class, however, may also state an equal protection violation under the "class of one" theory. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Under that theory, a plaintiff must allege that "she [or he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* To support a class-of-one claim, the plaintiff must allege an "extremely high degree of similarity" with the person to whom he compares himself. *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (Sotomayor, J.). The plaintiff's circumstances and the other person's circumstances must be "*prima facie* identical." *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005) (internal quotation marks and citation omitted), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008).

Webb identifies two former death row inmates, Sedrick Cobb and Russell Peeler, who have been resentenced to terms of life without the possibility of release and have been reclassified to a status that does not require them to wear restraints when moving outside of their cells. In addition, prison officials reclassified two other former death row inmates, Steven Hayes

and Joshua Komisarjevsky, after a state court judge resentenced them to life without the possibility of release. The prison officials transferred Hayes and Komisarjevsky to a prison facility in another state with less restrictive conditions of confinement.

Although Webb compares himself to two inmates who are not required to wear restraints when they leave their cells, he has not alleged sufficient facts to show the necessary degree of similarity to those inmates to state a class-of-one equal protection claim. Webb concedes that prison officials determined that he should remain on special circumstances status because of his prior violent behavior. He does not deny that he assaulted a correctional officer in 2010. Nor does Webb allege that the other two identified former death row inmates had engaged in assaultive or other dangerous behavior that might threaten the safety and security of inmates, staff or the facility. Thus, Webb has not asserted facts to show that he was essentially identical to the other former death row inmates who are no longer subject to the out-of-cell restraint policy. As such, he has not met the requirements necessary to state a plausible class-of-one equal protection claim. *See Ruston v. Town Bd. for the Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (affirming dismissal of equal protection claim on ground that mere allegation of less favorable treatment than "similarly situated" persons failed to state plausible "class of one" equal protection claim) (citation omitted); *Riley v. Roycroft*, 2017 WL 782917, at *8 (S.D.N.Y. Feb. 28, 2017) (conclusory allegation that inmate was denied medical care that was provided to other "inmates with the same medical condition" did not state viable equal protection claim, because inmate "fail[ed] to allege facts that demonstrate[d] a substantial similarity between himself and the other inmates with whom he compare[d] himself"); *Page v. Lantz*, 2007 WL 1834519, at *6 (D. Conn. June 25, 2007) ("Although the . . . [class of one] inquiry is usually fact-intensive, here [plaintiff] has failed entirely to allege that similarly situated prisoners . . . continued to receive

legal assistance . . . while he did not.") (internal citations omitted). Accordingly, I dismiss without prejudice Webb's Fourteenth Amendment equal protection claim for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915A(b)(1). If Webb wishes to re-plead this claim, he must file an amended complaint within thirty days of this Order.

## C. Fifth Amendment Claim

Webb generally contends that the defendants have been responsible for the conditions of confinement at Northern and that they will continue to cause "injuries and violations of his rights" under the Double Jeopardy Clause of the Fifth Amendment "to be free of being punished continuously and multiple times for the same offense." Compl., Doc. No. 1, at ¶ 44. The Double Jeopardy Clause of the Fifth Amendment, made applicable to the States by the Fourteenth Amendment, prohibits both multiple punishments for the same offense and multiple prosecutions for the same offense. *See* U.S. Const. amend V ("[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb . . . ."); *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969) ("[T]he Fifth Amendment guarantee against double jeopardy. . . . consist[s] of three separate constitutional protections. It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.").

"[A] threshold requirement before the [D]ouble [J]eopardy [C]lause can be interposed successfully is that the initial proceeding at issue be the type in which jeopardy can attach." *Lockett v. Montemango*, 784 F.2d 78, 82 (2d Cir. 1986) (emphasis omitted). The Double Jeopardy Clause is limited to proceedings that are "essentially criminal." *Breed v. Jones*, 421 U.S. 519, 528 (1975); *see Green v. United States*, 355 U.S. 184, 187 (1957) ("The constitutional prohibition against 'double jeopardy' was designed to protect an individual from being subjected

to the hazards of trial and possible conviction more than once for an alleged offense."). Webb alleges no facts to suggest that the restrictive conditions and particular classification status were imposed through a criminal proceeding. To the contrary, prison classification decisions or hearings are civil in nature. *Porter v. Coughlin*, 421 F.3d 141, 149 (2d Cir. 2005) (Sotomayor, J.) (holding that a prison "disciplinary proceeding was civil in nature and therefore presented no violation of the Double Jeopardy Clause"); *Encarnacion v. McGinnis*, 2005 WL 3018728, at *3 (W.D.N.Y. Oct.26, 2005) ("[T]he double jeopardy clause is limited to criminal proceedings and does not pertain to prison disciplinary hearings."). Thus, the Double Jeopardy Clause of the Fifth Amendment is not applicable to Webb's case. I dismiss Webb's Fifth Amendment claim under section 1915A(b)(1).

D.  Fourteenth Amendment Due Process Claim

Webb argues that his reclassification to special circumstances high security status for an indefinite period violated his rights under the Due Process Clause of the Fourteenth Amendment. Not only did defendants Semple, Mulligan, Cournoyer and Quiros not afford him due process prior to reclassifying him, Webb alleges, but they also have not afforded him meaningful periodic reviews of his classification status.

1.  *Procedural Due Process*

Webb contends that his placement on special circumstances high security status includes a requirement that, before he leaves his cell, prison officials must apply handcuffs to his wrists behind his back, shackles on his ankles, and a tether chain around his waist connecting the handcuffs to the leg shackles. He argues that his confinement on special circumstances high security status and under the restrictive restraint policy is indefinite and constitutes an atypical

and significant hardship. He also contends that there is no provision for periodic, meaningful reviews of his placement on special circumstances status.

I note that as of June 16, 2016, the Department of Correction had implemented procedures to assess inmates who had been placed on Special Circumstances Status due to their convictions for a capital felony or felony murder. *See* Conn. Dep't of Corr. Admin. Directive 9.4(3)(CC) & 9.4(16), *available at* http://www.ct.gov/doc/LIB/doc/PDF/AD/ad0904.pdf. Pursuant to that directive, an inmate who (1) committed a capital felony prior to April 25, 2012, and whose sentence was reduced or commuted to life without the possibility of release, or (2) committed a felony murder with special circumstances after April 25, 2012, and who was sentenced to life without the possibility of release, is automatically placed on Special Circumstances Status and housed in Administrative Segregation until a reclassification process is completed. *See id.* The reclassification process involves the assessment of the risk that the inmate poses to other inmates and staff. *See id.* 9.4(16). The directive does not specify who is to undertake the assessment. *See id.* The reviewer may decide to place the inmate in Administrative Segregation or Protective Custody, or to maintain the inmate on Special Circumstances Status. *See id.* 9.4(16)& (A). An inmate who remains on Special Circumstances Status is housed in a maximum security housing unit and kept separate from all other inmates, other than inmates who also have been classified as Special Circumstances inmates. *See id.* 9.4(16)(A). The directive imposes specific conditions of confinement for Special Circumstances inmates. *See id.* 9.4(16)(B). A mental health employee is required to conduct an initial review of the inmate's placement after thirty days, and periodic reviews every ninety days thereafter. *See id.* 9.4(16)(C). The Commissioner or his or her designee is required to review the inmate's Special

Circumstances placement on an annual basis. *See id.* 9.4(16)(D). There is no provision for release from Special Circumstances Status. *See id.*

Webb claims that in September and December 2016, he received information from both Warden Mulligan and from the Director of Classification and Population Management regarding his initial and continued placement on Special Circumstances Status. Webb subsequently challenged his placement by writing to Commissioner Semple and Warden Mulligan. On February 1, 2017, he received a copy of the classification review, which stated that Webb would remain on Special Circumstances Status and be subject to the restraints when outside his cell.

In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court considered a due process claim raised by inmates who had been placed in a high security state prison for safety and security reasons, rather than disciplinary ones. In determining whether the inmates had a liberty interest in avoiding indefinite confinement in the very restrictive maximum security prison, the Court applied the standard set forth in *Sandin v. Connor*, 515 U.S. 472 (1995). *See Wilkinson*, 545 U.S. at 223 ("After *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is . . . the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'") (quoting *Sandin*, 515 U.S. at 484). The Court concluded that the restrictive conditions at the Ohio State Penitentiary "taken together . . . impose[d] an atypical and significant hardship" on inmates and gave "rise to a liberty interest in their avoidance." *Id.* at 224.

In view of the indefinite nature of Webb's confinement on Special Circumstances Status and the conditions to which Webb is subject while on that status, I conclude that Webb has stated a plausible claim that his reclassification and placement violated a protected liberty interest. In addition, Webb has stated a plausible claim that he was given inadequate process in connection

14

with his initial placement and continued confinement on Special Circumstances Status. *See Wilkinson*, 545 U.S. at 228–29 (concluding "informal, nonadversary procedures set forth in" *Hewitt v. Helms*, 459 U.S. 460 (1983)—i.e., "some notice of charges and an opportunity to be heard"—constituted the appropriate level of procedural safeguards for inmates faced with indefinite confinement in a restrictive maximum security prison); *Hewitt*, 459 U.S. at 477 n.9 (observing that "administrative segregation may not be used as a pretext for indefinite confinement of an inmate" and that "[p]rison officials must engage in some sort of periodic review of the confinement of such inmates"). The case will proceed against defendants Semple, Mulligan, Cournoyer, and Quiros on Webb's procedural due process claim relating to his placement on Special Circumstances Status after re-sentencing and his continued confinement on that status without meaningful periodic reviews.

2. *Substantive Due Process*

Webb also contends that his indefinite classification on Special Circumstances Status and the requirement, as part of that status, that he wear restraints every time he leaves his cell both constitute a violation of his substantive due process rights. Substantive due process protects individuals against government action that is "arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (citations and internal quotation marks omitted). "The first step in substantive due process analysis is to identify the constitutional right at stake." *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995). Here, the right allegedly violated was Webb's liberty interest in remaining free from classification to Special Circumstances Status, and thereby free from the requirement that he wear restraints every time he leaves his cell absent reasonable grounds to believe that he poses a threat to the order, safety,

or security of the correctional facility. Webb has plausibly alleged that the decision by Commissioner Semple, former Wardens Mulligan and Cournoyer, and Administrator Quiros to maintain him on Special Circumstances Status was arbitrary because there was no support for their conclusion that he posed a danger to other inmates or prison employees at the time of the reclassification. Accordingly, the case will proceed against defendants Semple, Mulligan, Cournoyer, and Quiros on Webb's substantive due process claim.

E. ADA and RA Claims

In the introductory paragraph of the complaint, Webb states that he seeks damages pursuant to the ADA and the RA. *See* Compl., Doc. No. 1, at ¶ 1. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

The Second Circuit has held that a plaintiff must meet three elements to state a claim under the ADA. The plaintiff must plead "(1) that he is a qualified individual with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusions or discrimination was due to his disability." *Hargrave v. Vermont*, 340 F.3d 27, 34–35 (2d Cir. 2003). To state a claim under the RA, the plaintiff must satisfy the same three elements, *Hargrave*, 340 F.3d at 35, and must also "show that the defendants receive federal funding." *See*

*Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003). "[A] private suit for money damages" for disability discrimination "may only be maintained against a state if the plaintiff can establish that the . . . violation was motivated by either discriminatory animus or ill will due to disability." *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 112 (2d Cir. 2001).

The Second Circuit has made clear that "[n]either Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials." *Id.* at 107; *Morales v. New York*, 22 F. Supp. 3d 256, 271 (S.D.N.Y. 2014) ("[T]here is no individual liability . . . under the Americans with Disabilities Act."); *Keitt v. New York City*, 882 F. Supp. 2d 412, 426 (S.D.N.Y. 2011) ("Individuals in their personal capacities are not proper defendants on claims brought under the ADA or the Rehabilitation Act."). Accordingly, I dismiss Webb's ADA and RA claims against the defendants in their individual capacities for lack of an arguable legal basis. *See* 28 U.S.C. § 1915A(b)(1).

Under the doctrine established by *Ex Parte Young*, 209 U.S. 123 (1908), however, "Title II and Rehabilitation Act suits for prospective injunctive relief may . . . proceed against individual officers in their *official* capacity." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (emphasis added). In addition, inmates may assert ADA claims for monetary damages against a state or individual officers in their official capacities "for conduct that *actually* violates the Fourteenth Amendment." *United States v. Georgia*, 546 U.S. 151, 159 (2006). Thus, I will consider Webb's claims for damages and injunctive relief against the defendants in their official capacities.

Webb states that he qualifies as disabled because he suffers from osteoarthritis in his knees and shoulders, and the condition limits one or more of his major life activities. Specifically, Webb states that his arthritis makes it difficult for him to squat down in order to put

his wrists through the trap in the cell door to be handcuffed every time he leaves his cell. Webb has not asserted that the defendants discriminated against him or treated him differently because of his arthritic condition. *See Laurent v. G & G Bus Serv.*, 2011 WL 2693651, at *1 (S.D.N.Y. July 11, 2011) ("[C]onclusory allegations that [a plaintiff] was discriminated against in violation of . . . the Americans with Disabilities Act . . . do not state [a] plausible claim[] for violation of th[at] statute[]."); *Elbert v. N.Y. State Dep't of Corr'l Servs.*, 751 F. Supp. 2d 590, 595 (S.D.N.Y. 2010) ("Courts routinely dismiss ADA suits by disabled inmates that allege inadequate medical treatment, but do not allege that the inmate was treated differently because of his disability."); *Atkins v. Cnty. of Orange*, 251 F. Supp. 2d 1225, 1232 (S.D.N.Y. 2003) ("With no allegation of disparate treatment, no claim for discrimination under the ADA or Rehabilitation Act lies."). Rather, Webb claims that he was treated the same as any other former death row inmate who had not been relieved of the out-of-cell restraint policy, and seeks to be treated differently than other inmates because of his disability. Furthermore, Webb does not allege that the defendants excluded him from or denied him the benefits of any services, programs or activities because of his disability. *See Nails v. Laplante*, 596 F. Supp. 2d 475, 481–82 (D. Conn. 2009) (dismissing inmate's ADA claim because the complaint "d[id] not include any non-conclusory allegations of discriminatory animus or ill will based on his disability and identifie[d] no program he could not participate in or any service that was denied as a result of his disability").

Webb fails to state a claim against the defendants under either the ADA or the RA. I dismiss the ADA and RA claims with respect to all defendants. *See* 28 U.S.C. § 1915A(b)(1).

## II. Motion for Appointment of Counsel [Doc. No. 10]

Civil litigants, unlike criminal defendants, do not have a constitutional right to the appointment of counsel. *See Hodge v. Police Officers*, 802 F.2d 58, 60 (2d Cir. 1986) (district

judges are afforded "broad discretion" in determining whether to appoint *pro bono* counsel for an indigent litigant in a civil case); 28 U.S.C. § 1915(e)(1) ("The court *may* request an attorney to represent any person unable to afford counsel.") (emphasis added). The Second Circuit has made clear that "before appointment [is] even considered" in a civil action, the litigant must show that he or she is "unable to obtain counsel" or legal assistance. *See Hodge*, 802 F.2d at 61.

Webb generally states that he mailed out letters to attorneys seeking their assistance. He does not indicate when he sent the letters to counsel, the names of the attorneys to whom the letters were addresses or whether he received any responses to his letters. These undocumented attempts are insufficient to demonstrate that Webb is unable to secure representation without the intervention of the court.

Webb also claims that the Inmate Legal Aid Program cannot meet his needs because they do not employ a sufficient number of legal staff to assist all of the inmates housed at Northern. Webb does not indicate, however, that he even made an attempt to seek the assistance of an attorney or paralegal who works for the Program with regard to any questions he might have about litigating this case. The court concludes that Webb has not demonstrated that he cannot secure the assistance of counsel on his own.

Because there is a possibility that Webb may be able to secure legal assistance or representation independently, the motion for appointment of counsel is denied without prejudice. Webb may renew his motion at a later stage of the litigation, after he has made attempts to secure the assistance of counsel.

**III.    Orders**

It is hereby ordered that:

**(1)**	The Fifth Amendment double jeopardy claim, the Eighth Amendment conditions of confinement claims and the Fourteenth Amendment equal protection claim against all defendants are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1). Thus, all claims against defendants Arnone, Dzurenda, Maldonado, Murphy and Quiros, in his capacity as Warden of Northern, have been **DISMISSED**; the dismissals are with prejudice, except for the dismissal of the class-of-one equal protection claim, which can be repleaded within thirty days. The Fourteenth Amendment due process claims will proceed against defendants Scott Semple, Warden William Mulligan, Warden Anne Cournoyer, and District Administrator Quiros in their individual and official capacities. Should Webb choose to appeal this decision, he may not do so *in forma pauperis*, because such an appeal would not be taken in good faith. *See* 28 U.S.C. § 1915(a)(3).

The Motion for Appointment of Counsel [**Doc. No. 10**] is **DENIED** without prejudice to refiling at a later stage of litigation. Any renewal of this motion shall be accompanied by a summary of any attempts to obtain counsel or legal assistance, including the names of the attorneys contacted, the dates upon which Webb made those contacts and the reasons why assistance was unavailable.

**(2)**	Within twenty-one (21) days of this Order, the Clerk shall prepare a summons form and send an official capacity service packet to the U.S. Marshal's Service. The U.S. Marshals Service shall serve the summons, a copy of the complaint and this order on defendants Semple, Quiros, Mulligan, and Cournoyer in their official capacities by delivering the necessary documents in person to the Office of the Attorney General, 55 Elm Street, Hartford, CT  06141.

**(3)**	Within twenty-one (21) days of this Order, the Clerk shall ascertain from the Department of Correction Office of Legal Affairs the current work addresses for District

Administrator Angel Quiros, Commissioner Scott Semple, Warden William Mulligan, and Warden Anne Cournoyer, and shall mail a copy of the complaint, this order and a waiver of service of process request packet to each defendant in his or her individual capacity at his or her current work address. On the thirty-fifth (35th) day after mailing, the Clerk shall report to the court on the status of each request. If any defendant fails to return the waiver request, then the Clerk shall make arrangements for in-person service by the U.S. Marshals Service and the defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(4) Defendants Mulligan, Cournoyer, Semple, and Quiros shall file their response to the complaint, either an answer or motion to dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to them. If the defendants choose to file an answer, then they shall admit or deny the allegations and respond to the cognizable claims recited above. They may also include any and all additional defenses permitted by the Federal Rules.

(5) Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within six months (180 days) from the date of this order. Discovery requests should not be filed with the court.

(6) All motions for summary judgment shall be filed within seven months (210 days) from the date of this order.

(7) The Pro Se Prisoner Litigation Office shall send a courtesy copy of the complaint and this order to the Connecticut Attorney General and the Department of Correction Legal Affairs Unit.

So ordered.

Dated at Bridgeport, Connecticut, this 1st day of August 2018.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge